316 Ga. 426
FINAL COPY

S23A0167. KNOX et al. v. STATE OF GEORGIA.

ELLINGTON, Justice.

Five University System of Georgia ("USG") professors[1] filed suit to block a 2017 statutory amendment that removed public colleges and other public postsecondary educational institutions from the statutory definition of "school safety zone." Before the 2017 amendment, carrying or possessing a weapon on any real property or in any building owned by or leased to any postsecondary educational institution was a misdemeanor, and the 2017 amendment decriminalized that conduct. The professors alleged that, as a result of the 2017 amendment, the Code requires the Board of Regents, the USG, and USG institutions to permit persons to carry or possess weapons on the campuses of public postsecondary

---

[1] The plaintiffs below are John Knox, Michael G. Noll, James Porter, Laurel Robinson, and William B. Whitman. A sixth professor, Aristotelis Santas, joined as a plaintiff in the professors' first complaint, but he did not join in the plaintiffs' amended complaint.

educational institutions, contrary to longstanding USG policies. The professors sought a declaration that the statutory amendment is unconstitutional as applied because it usurps the Board's constitutional authority to govern, control, and manage the USG and its member institutions.

The trial court granted the State of Georgia's motion to dismiss the complaint and denied the professors' request for declaratory relief, ruling that the trial court lacked jurisdiction on three alternative grounds, including mootness. Because the complaint shows that the Board adopted gun-carrying policies consistent with the 2017 statutory amendment, the question of whether the amendment usurped the constitutional authority of the Board to govern, control, and manage the USG and its member institutions became moot. Consequently, the trial court lacked jurisdiction to adjudicate the professors' as-applied challenge, and we affirm the judgment dismissing the professors' complaint on that basis alone.

Georgia's Constitution provides for judicial review of statutes. See Ga. Const. of 1983, Art. I, Sec. II, Par. V (a) (Legislative acts in

2

violation of the Constitution "are void, and the judiciary shall so declare them."). An action against the State of Georgia in the superior court for a declaratory judgment is the appropriate litigation mechanism for such review, and enforcement of unconstitutional statutes may be enjoined. See Ga. Const. of 1983, Art. I, Sec. II, Par. V (b);[2] OCGA §§ 9-4-2; 9-4-3. A declaratory judgment may be entered, however, only in the case of an "actual controversy," OCGA § 9-4-2 (a), where the plaintiff needs "relief from uncertainty and insecurity with respect to rights, status, and other legal relations." OCGA § 9-4-1. See *Gwinnett County v. Blaney*, 275 Ga. 696, 703 (1) (572 SE2d 553) (2002).

"[T]he proper scope of declaratory judgment is to adjudge those rights among parties upon which their future conduct depends." *Sexual Offender Registration Review Bd. v. Berzett*, 301 Ga. 391, 393

---

[2] We note that the professors name the State of Georgia as the only defendant, and they claim that the State has waived sovereign immunity as to their constitutional challenge, based on an amendment to the judicial review paragraph, adding Art. I, Sec. II, Par. V (b), that the people of Georgia ratified in 2020. Because we affirm the trial court's dismissal on jurisdictional grounds, we do not reach the parties' arguments about whether Art. I, Sec. II, Par. V (b) applies to the professors' claims. Likewise, we do not reach the issue of standing.

(801 SE2d 821) (2017) (citation and punctuation omitted). There can be no actual or justiciable controversy if the questions in the case have become moot. See id. "A petition for declaratory judgment is moot when the relief, if granted, would have no practical effect on the underlying controversy." Id. In particular, a court "has no province to determine whether or not a statute, in the abstract, is valid[.]" *Fourth Street Baptist Church of Columbus v. Bd. of Registrars*, 253 Ga. 368, 369 (1) (320 SE2d 543) (1984). See also *Berzett*, 301 Ga. at 396 ("[I]t is a settled principle of Georgia law that the jurisdiction of the courts is confined to justiciable controversies, and we will not decide the constitutionality of a law where no justiciable case or controversy is presented." (citation and punctuation omitted)). When a petition for declaratory judgment is moot, the trial court is required to dismiss the action. See id. at 395-396; see also *Baker v. City of Marietta*, 271 Ga. 210, 214 (1) (518 SE2d 879) (1999) ("Where the party seeking declaratory judgment does not show it is in a position of uncertainty as to an alleged right, dismissal of the declaratory judgment action is proper[.]").

In this case, taking the allegations in the professors' amended complaint as true,[3] the complaint shows that there is no actual, justiciable controversy to authorize declaratory relief. The complaint alleges the following. The Georgia Constitution endows the Board with plenary authority over the USG and its member institutions.[4] To promote its educational mission and to ensure a safe learning,

---

[3] See *Sons of Confederate Veterans v. Henry County Bd. of Commrs.*, 315 Ga. 39, 63 (2) (c) (iii) (880 SE2d 168) (2022) ("At the motion to dismiss stage, we accept as true all well-pled material allegations in the complaint."); *Ewing v. City of Atlanta*, 281 Ga. 652, 653 (2) (642 SE2d 100) (2007) ("In reviewing the grant of a motion to dismiss, an appellate court must construe the pleadings in the light most favorable to the appellant with all doubts resolved in the appellant's favor. A motion to dismiss should only be granted if the allegations of the complaint, construed most favorably to the plaintiff, disclose with certainty that the plaintiff would not be entitled to relief under any state of provable facts." (citation and punctuation omitted)).

[4] See Ga. Const. of 1983, Art. VIII, Sec. IV, Par. I (b) ("The government, control, and management of the University System of Georgia and all of the institutions in said system shall be vested in the Board of Regents of the University System of Georgia.") (amendment ratified in 1943); OCGA §§ 20-3-21 (establishing how the Board shall be constituted); 20-3-31 (establishing general powers of the Board); 20-3-51 ("The government, control, and management of the university system and all of its institutions shall be vested in the board of regents."); *Bd. of Regents of the Univ. System of Ga. v. Doe*, 278 Ga. App. 878, 885 (2) (a) (630 SE2d 85) (2006) ("In managing its member institutions, the Board's powers are plenary, untrammeled except by such restraints of law as are directly expressed, or necessarily implied. Under the powers granted, it becomes necessary to look for limitations, rather than for authority to do specific acts. Limited only by their proper discretion and by the Constitution and law of this State, they may exercise any power usually granted to such corporations." (citation and punctuation omitted)).

5

working, and research environment, the Board has prohibited guns within the USG since at least as far back as 1810. The Georgia Code previously mirrored the USG's no-guns policy, specifically, by providing in OCGA § 16-11-127.1 that university campuses were "school safety zones" where carrying or possessing a weapon, including a firearm, triggered criminal penalties.[5] More recently, the General Assembly declared "that the regulation of firearms and other weapons is properly an issue of general, state-wide concern" and prohibited counties and cities from regulating in any manner the possession or carrying of firearms. OCGA § 16-11-173 (a), (b) (1) (2005).[6] In 2014, the General Assembly greatly expanded the areas

---

[5] See Ga. Const. of 1983, Art. I, Sec. I, Par. VIII ("The right of the people to keep and bear arms shall not be infringed, but the General Assembly shall have power to prescribe the manner in which arms may be borne."); Ga. L. 1994, p. 1012, § 4 (adding public or private technical schools, vocational schools, colleges, universities, and other institutions of postsecondary education to the definition of "school safety zone," where, unless otherwise provided, it was a felony to carry any weapon while within a school safety zone or at a school building, school function, or school property or on transportation furnished by the school); see also Ga. L. 2010, p. 963, § 1-4 (reducing the criminal penalty for weapons carry license holders).

[6] See Ga. L. 2005, p. 613, § 1.

6

where licensed gun owners could take their weapons.[7] The General Assembly also added state authorities, including any "board," to those entities expressly prohibited from regulating the possession or carrying of firearms or other weapons.[8] At that time, carrying weapons was still restricted on college campuses under the statutes regulating "school safety zones."[9]

The complaint also shows that, after years of opposition by the Board and USG institution leaders to proposed "campus carry" legislation, the General Assembly in 2017 amended the definition of "school safety zone" to remove the criminal penalties for carrying weapons on college campuses, with several exceptions. See Ga. L. 2017, p. 341, § 1 (HB 280).[10] In the absence of the statutory provision

---

[7] See OCGA § 16-11-127 (c) (2014) (Generally, license holders "shall be authorized to carry a weapon . . . in every location in this state," except as limited by statute or on private property per the property owner's policy.); Ga. L. 2014, p. 599, § 1-5.

[8] See OCGA § 16-11-173 (b) (1) (2014); Ga. L. 2014, p. 599, § 1-11.

[9] See OCGA §§ 16-11-127.1 (a) (3) (B) (2014) (defining property owned or leased by "[a]ny public or private technical school, vocational school, college, university, or other institution of postsecondary education" as a school safety zone); 16-11-127.1 (b) (1) (2014) (making it unlawful to carry weapons in school safety zones).

[10] In pertinent part, OCGA § 16-11-127.1 (c) (2017) as amended provided:

7

The provisions of this Code section [making it unlawful for any person to carry or possess any weapon while within a school safety zone, at a school function, or on a bus or other transportation furnished by a school] shall not apply to:

. . .

(20) (A) Any weapons carry license holder when he or she is in any building or on real property owned by or leased to any public technical school, vocational school, college, or university, or other public institution of postsecondary education; provided, however, that such exception shall:

(i) Not apply to buildings or property used for athletic sporting events or student housing, including, but not limited to, fraternity and sorority houses;

(ii) Not apply to any preschool or childcare space located within such buildings or real property;

(iii) Not apply to any room or space being used for classes related to a college and career academy or other specialized school as provided for under Code Section 20-4-37;

(iv) Not apply to any room or space being used for classes in which high school students are enrolled through a dual enrollment program, including, but not limited to, classes related to the "Move on When Ready Act" as provided for under Code Section 20-2-161.3;

(v) Not apply to faculty, staff, or administrative offices or rooms where disciplinary proceedings are conducted;

(vi) Only apply to the carrying of handguns which a licensee is licensed to carry pursuant to subsection (e) of Code Section 16-11-126 and pursuant to Code Section 16-11-129; and

(vii) Only apply to the carrying of handguns which are concealed.

(B) Any weapons carry license holder who carries a handgun in a manner or in a building, property, room, or space in violation of this paragraph shall be guilty of a misdemeanor; provided, however, that for a conviction of a first offense, such weapons carry license holder shall be punished by a fine of $25.00 and not be sentenced to serve

8

that criminalized carrying guns on university and college campuses, as it existed prior to the 2017 amendment (HB 280), OCGA §§ 16-11-127, 16-11-127.1, and 16-11-173 operate together to require that guns be allowed on USG campuses in ways that the professors allege are contrary to "the Board of Regents' and University System institutions' own duly adopted policies reflecting their independent

---

any term of confinement.
(C) As used in this paragraph, the term:
(i) "Concealed" means carried in such a fashion that does not actively solicit the attention of others and is not prominently, openly, and intentionally displayed except for purposes of defense of self or others. Such term shall include, but not be limited to, carrying on one's person while such handgun is substantially, but not necessarily completely, covered by an article of clothing which is worn by such person, carrying within a bag of a nondescript nature which is being carried about by such person, or carrying in any other fashion as to not be clearly discernible by the passive observation of others.
(ii) "Preschool or childcare space" means any room or continuous collection of rooms or any enclosed outdoor facilities which are separated from other spaces by an electronic mechanism or human-staffed point of controlled access and designated for the provision of preschool or childcare services, including, but not limited to, preschool or childcare services licensed or regulated under Article 1 of Chapter 1A of Title 20.

See also Ga. L. 2022, p. 74, §§ 6, 7 (replacing "license holder" with "lawful weapons carrier" in OCGA §§ 16-11-127 (c) and 16-11-127.1).

9

judgment." After the governor approved HB 280, the Board's chancellor provided guidance to USG institutions to "implement the law as written" and called for each institution to "review its campus conduct and weapons policies to ensure that they comply with these changes to the law." The Board of Regents then amended its Policy Manual and adopted a weapons policy, applicable to all USG institutions, that largely mirrored the 2017 statutory amendments, including the definitions of "weapon" and "concealed" and the authority of weapons carry license holders to carry handguns on USG campuses, subject to the same exceptions set out in the 2017 amendment to OCGA § 16-11-127.1. In the complaint, the professors articulated in detail reasons they believe that the revised policy regarding the carrying of weapons on USG campuses, following the 2017 statutory amendments, greatly increases the risk of injury and death to themselves, their students, and other persons on USG campuses, and significantly impairs their ability to fulfill their role in the educational mission of the USG.

The crux of the professors' constitutional challenge to the 2017

amendment is that, in adopting the amendment, the General Assembly, to the detriment of the USG's educational mission, "usurp[ed] the Board of Regents' constitutionally conferred, exclusive authority over the government, control, and management" of the USG, specifically, the Board's "authority to regulate, in its independent judgment, guns on college campuses." The professors alleged that they are injured by what they deem a "separation-of-powers violation."[11] They argue that the trial court erred to the extent that it dismissed their claim as moot, arguing that, "[a]s a matter of law, a separation-of-powers violation is not mooted by the fact that the encroached-upon entity has acquiesced — or even affirmatively approved of — the encroachment."

The professors acknowledge the absence of Georgia precedent for this principle and cite as persuasive authority several United States Supreme Court cases. But even assuming we found these federal cases persuasive, they do not lead to a conclusion in this case

---

[11] See Ga. Const. of 1983, Art. I, Sec. II, Par. III ("The legislative, judicial, and executive powers shall forever remain separate and distinct[.]").

11

that the professors' claims are not moot. These federal cases share a

common thread that does not run through this case. In those cases,

a legislative act challenged on separation-of-powers or Tenth

Amendment grounds directly caused the harm complained of, such

that some indication of agreement with the legislative act by the

allegedly-encroached-upon entity could not moot a challenge to the

legislation.[12] Here, in contrast, the Board formally took its own

---

[12] See *Selia Law LLC v. Consumer Financial Protection Bureau*, ___ U. S. ___ (140 SCt 2183, 2192, 2196, 207 LE2d 494) (2020) (concluding that the structure of a new regulatory agency created by Congress violated separation-of-powers principles by insulating the director from removal by the President; rejecting the argument that a litigant challenging an action by the agency must show that the act would not have been taken if the director had been subject to presidential control); *Free Enterprise Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 497-498 (130 SCt 3138, 177 LE2d 706) (2010) (concluding that Congress's creation of federal accounting oversight board that was not subject to presidential control violated separation-of-powers principles, notwithstanding that the President signed the act creating the board without expressing any separation-of-powers concerns); *New York v. United States*, 505 U. S. 144, 177, 180-183 (112 SCt 2408, 120 LE2d 120) (1992) (concluding that congressional act regarding states' disposal of radioactive waste violated Tenth Amendment, notwithstanding that public officials from the state challenging the law "lent their support to the Act's enactment"); *Metro. Washington Airports Auth. v. Citizens for Abatement of Aircraft Noise*, 501 U. S. 252, 264-270, 276-277 & n.13 (111 SCt 2298, 115 LE2d 236) (1991) (concluding that a congressional act conditioning the transfer of operating control of certain airports on the creation of an oversight board comprised of members of Congress violated separation-of-powers principles notwithstanding that the board was established by the bylaws of airports authority that was created by legislation enacted by Virginia and the District of Columbia; the challenge to

action to adopt a particular policy, and it is this policy, not any legislation, that is causing the state of affairs about which the professors complain.

In determining that this action by the Board moots the professors' challenge to the 2017 amendment, we do not concern ourselves with *why* the Board took this action. We do not look behind the exercise of government power to determine the subjective reasons — legal, political, or otherwise — for a particular action, so long as the action was within the government actor's authority. Indeed, it is difficult to conceive of a significant executive- or

the oversight board's veto power was ripe even if that power had not yet been exercised to challengers' detriment); see also *Nat. Labor Relations Bd. v. Canning*, 573 U. S. 513, 570-572 (134 SCt 2550, 189 LE2d 538) (2014) (Scalia, J., concurring) (rejecting the Court's reliance on the Senate's historical failure to counter "with sufficient vigor" presidents' reliance on the Recess Appointments Clause to fill vacancies that initially occur before, but continue to exist during, a recess of the Senate; citing precedent that, "[s]ince the separation of powers exists for the protection of individual liberty, its vitality does not depend on whether the encroached-upon branch approves the encroachment" (citations and punctuation omitted)); *Glidden Co. v. Zdanok*, 370 U. S. 530, 532-533 (82 SCt 1459, 8 LE2d 671) (1962) (plurality opinion) (considering an argument that litigants were denied the protection guaranteed by Article III of having judges with tenure and compensation preside over their cases, notwithstanding that the Chief Justice of the United States, pursuant to statute, had designated the judges to preside over the cases).

legislative-branch action where the knowledge of the positions of *various* other governmental actors will not factor into the decision.

Here, what matters is not why the Board adopted the policy in question, but merely that it did do so. Granting the only relief the professors seek — a declaration that the 2017 amendment to OCGA § 16-11-127.1 constituted a separation-of-powers violation — would not eliminate the harm of which the professors complain, because it would not eliminate the immediate source of that alleged harm — the weapons policy adopted by the Board. That this sought-after relief would not redress the professors' stated grievance means that this case is moot. The trial court thus did not err in dismissing the professors' complaint. See *Berzett*, 301 Ga. at 394-396; *Baker*, 271 Ga. at 214-215 (1); *Fourth Street Baptist Church*, 253 Ga. at 369 (1).

*Judgment affirmed. All the Justices concur, except Warren, McMillian, and Pinson, JJ., disqualified.*

14

Decided May 31, 2023.

Firearms on campus; constitutional question. Fulton Superior Court. Before Judge Adams.

*Jones Day, Peter C. Canfield, Brian C. Lea, Sharnell S. Simon, Amanda K. Rice*, for appellants.

*Christopher M. Carr, Attorney General, Bryan K. Webb, Deputy Attorney General, Russell D. Willard, Annette M. Cowart, Senior Assistant Attorneys General*, for appellee.

*Caplan Cobb, Michael A. Caplan, Sarah Brewerton-Palmer*, amici curiae.